## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ORGANIC SEDIMENT REMOVAL SYSTEMS, LIMITED LIABILITY COMPANY, a Wisconsin Limited liability company, )<br>)<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>BRIAN PIRL and MIDWEST CAPS & ACCESSORIES, INC. d/b/a U S AQUA VAC INC., an Illinois Corporation, )<br>)<br>)<br>)<br>Defendants. ) | Case No. 1:08-cv-00976<br><br>Hon. Marvin E. Aspen<br><br>**JURY DEMANDED** |

### DECLARATION OF RICHARD KOHUTKO

Under the penalties of perjury as set forth in 28 U.S.C. § 1745, if called upon, I could competently testify as follows:

1. I am over 18 years of age and mentally competent to make this Declaration. This Declaration is based in large part on my own personal knowledge.

2. I am the sole member of Organic Sediment Removal Systems, Limited Liability Company, a Wisconsin LLC ("OSR").

3. The beginnings of OSR's business date back to 1989. OSR is in the business of cleaning the bottoms of ponds and other waterways, such as those found on golf courses. The primary tools of OSR in performing its services are an apparatus that OSR has created and innovated through its years of experience (the "OSR Apparatus") and the specialized methodologies, procedures and processes that OSR uses to perform its services (the "Processes"), both through the use of the OSR Apparatus and otherwise.

4.  I understand that the trade secrets that OSR seeks to protect in this lawsuit ("Trade Secrets") are as follows: (1) the assembly of the OSR Apparatus; (2) how the various components of the OSR Apparatus function and interact; (3) techniques in using the OSR Apparatus; (4) pricing and competitive bidding information; (5) potential customer contacts and the process of researching and finding targets and leads; and, (6) processes outside of the assembly and use of the OSR Apparatus. For example, one of the many OSR innovations allows two divers to work on the same OSR Apparatus at the same time.

5.  By May, 2006, OSR had reduced its Processes to writing, in the form of what has become a "procedures manual" that OSR characterizes as its "bible" (the "Manual"). True and correct copies of photographs depicting the OSR Apparatus as well as the Manual are attached as Attachments 1 and 2 respectively.

6.  While the cleaning of "muck" from the bottom of a pond may on first blush sound like it does not involve "rocket science," OSR has in fact made the performance of its services a science. Our competitors use far less efficient and more cumbersome methods such as barges and traditional "dredging" of waterways.

7.  In fact, OSR's "know-how" is so valuable that OSR has been able to sell its know-how in the form of distributorships (through its business partner Sediment Removal Solutions, Inc., or "SRS." I may refer to SRS and OSR in this affidavit collectively as "OSR."). Additionally, SRS itself, through a November, 2007 transaction, purchased from OSR a portion of OSR's business to allow SRS to distribute OSR's muck cleaning know-how and business practices to others, and OSR retains an economic interest in such distributorships.

8.  Since on and before May, 2006, OSR has protected the secrecy of its Trade Secrets through the following measures:

a. OSR does not publicly advertise the OSR Apparatus or Processes. For example, OSR's Internet website as well as its other advertising materials does not depict the entire OSR Apparatus through a photograph, diagram or other visual aid;

b. OSR has required its divers, including Pirl, and potential and actual distributors to execute Confidentiality and Non-Disclosure Agreements to protect OSR trade secrets;

c. OSR's executive staff does not allow customer contact information to be freely disseminated to OSR representatives such as its divers; and,

d. OSR's executive staff attempts to restrict information regarding OSR's pricing to OSR's executive and sales staff (excluding divers) who needs to know such information. For example, OSR does not advertise its pricing information or variables that affect pricing.

9. OSR hired Pirl, now a former employee of OSR, as a diver on or about May 8, 2006. Pirl executed a "Confidentiality and Non-Disclosure Agreement" (the "Confidentiality Agreement") dated that same day. Pursuant to the Confidentiality Agreement, both during his employment and thereafter, Pirl agreed not to reproduce, divulge, publish, communicate, use or utilize without OSR's express written consent information defined therein as "Business Trade Secrets" or "Confidential Information." Pursuant to the Confidentiality Agreement, Pirl also agreed to return all Confidential Information (including Business Trade Secrets) within fifteen days of OSR's demand for the return thereof. "Business Trade Secrets" are defined as "all information relating to business programs, products, applications, systems, technologies and business procedures." Such definition refers specifically, among other things, to the OSR Apparatus and the Processes. "Confidential Information" is defined as all OSR information relating to OSR's Business Trade Secrets belonging to OSR and not in the public domain.

10. On September 12, 2006, Pirl quit his job at OSR a mere four months or so after starting his job at OSR. As an OSR diver, Pirl was trained in OSR's Trade Secrets, such as how

to use the OSR Apparatus and how to implement and follow the Processes espoused in the Manual. Further, Pirl during at least one OSR work trip to Appleton, Wisconsin in August, 2006, had access to drafts of the Manual itself, and I have reason to believe that Pirl misappropriated information from those drafts during that trip.

11. I learned in 2008 that Pirl formed "Midwest Caps & Accessories, Inc." as an Illinois corporation on May 24, 2005, well before he joined OSR. Prior to Pirl joining OSR, I never knew this entity to be a competitor of OSR's. But, as I have more recently discovered, on August 24, 2006, **before he resigned from OSR**, Pirl applied for a d/b/a for the "Midwest Caps" entity, "U S Aqua Vac Inc." Pirl now does business under "U S Aqua Vac Inc.," a direct competitor of OSR and SRS.

12. Photos of the OSR Apparatus and the device used by Pirl, show that Pirl's "Aqua Vac" is a copy of OSR's device. *See*, Attachment 1(a) and 1(b), true and correct copies of photos showing both the OSR Apparatus and the similar apparatus used by US to perform jobs near Rockford, Illinois in May and June, 2008.

13. Since August, 2006, Pirl has done business under the name U S Aqua Vac ("US") and has directly competed, or attempted to compete with OSR (and investigation continues as to whether Pirl was directly competing while employed by OSR). US' Internet website, www.usaquavac.com, indicates that US is now in the same business as OSR, though it was not in OSR's same business prior to OSR's employment of Pirl.

14. US did not conduct any business in the area of OSR's business until after Pirl became employed with OSR. Likewise, at the time he was hired by OSR, Pirl did not have any meaningful experience in the area of business conducted by OSR and did not have the technical expertise or skill to even think about competing against OSR. US, doing business as "US Aqua

4

Vac, Inc.," is currently competing aggressively with OSR and threatens to deprive OSR of the value of its Trade Secrets.

15. Starting at the time of his departure from OSR in September, 2006, and perhaps even earlier, Pirl breached his Confidentiality Agreement with OSR in the following ways:

 a. By using a device similar to the OSR Apparatus in US' business operations. I have reason to believe that Pirl, while employed at OSR, illicitly took photographs of the OSR Apparatus to enable him to attempt to replicate the OSR Apparatus for use in US' business operations;

 b. By using Processes that he learned while employed at OSR in US' business operations;

 c. By using knowledge of OSR's pricing information illicitly obtained while employed by OSR to undercut OSR in bidding and to otherwise gain an improper competitive advantage;

 d. By using knowledge of OSR's customer contact information illicitly obtained while employed by OSR to contact potential OSR customers on behalf of US;

 e. By publishing marketing materials which are substantially similar to aspects of OSR's marketing materials;

 f. By publishing OSR's confidential information to the public-at-large, including, but not limited to, in a magazine article. This magazine article was believed to be authored in some way, shape or form by Pirl. A true and correct copy of this article is attached as Attachment 3. The article states in part: "The most common methods of dredging are draining down the pond and mechanically excavating the muck, or, using a barge that sucks up the muck below and pumps it to a holding area. Both options are expensive, require large equipment driving across the course, and leave a small mountain of muck that smells, leaves a mess and must be removed. After exploring the usual options, we discovered another method offered by US Aqua-Vac. As the name implies, they use divers equipped with suction hoses that basically vacuum the muck from the pond floor. Each diver has a hose and works in a small area at a time. They move along the bottom of the pond vacuuming the muck until they reach the original pond floor, which they can determine by feel;" and,

 g. By otherwise misappropriating OSR Trade Secrets in US' business operations.

OSR has made written demand for the return of trade secrets taken and misappropriated by Pirl on at least two (2) separate occasions. Pirl has failed to accede to such demands. True and correct copies of these demands are attached as Attachment 3.

16. Pirl and US further continue to use OSR's trade secrets in US' business as "US Aqua Vac, Inc."

17. OSR's competitors have not developed such advanced methods and/or devices to complete the services performed with the OSR Apparatus and OSR's Processes because of the investment required, and continue to use more cumbersome and messier methods such as draining the pond or waterway or using a barge to remove the sediment and "muck" that can be found on the bottom of ponds and other waterways. Without taking OSR's Trade Secrets and other confidential information, it would have taken Pirl years of research and development to develop a device similar to the OSR Apparatus and Processes and cost him a considerable amount of time and money (like it took OSR all of those years to develop these trade secrets). Without Pirl and US, OSR would have no direct competition for providing its services from any competitor using anything remotely similar to the OSR Apparatus and the Processes.

18. OSR has not made its device and Processes available to the public in any way and requires all persons granted knowledge of or exposure to OSR's Trade Secrets to execute confidentiality agreements covenanting to not only keep such information secret but to "not use the Confidential Information or any part thereof as a basis for the creation of any method, systems, business or product similar to [OSR's] products embodied in the Confidential Information unless expressly authorized in writing by [OSR]."

19. OSR's pricing information is likewise not readily obtainable from any public source and is important to OSR's business program and proprietary methodologies, systems,

procedures and protocols not available to OSR's competitors. The formula underlying OSR's pricing cannot therefore be completely derived from any information known to either OSR's competitors or customers.

20. Further, in addition to protecting such information with confidentiality agreements, OSR disseminates confidential information on a need-to-know basis and does not make such information available to persons outside OSR's executive and sales staff such as divers like Pirl was at OSR.

21. OSR's customer information is likewise not readily ascertainable from any public source. OSR seeks to protect with its request of an injunction the compilation of customer prospects and contacts it has developed over years. OSR identified such prospects with the expenditure of a significant amount of time, effort and money and to gather a comparable list of real prospects, OSR's competitors would have to do the same.

22. As shown in the photos included in Attachment 1(a), US has developed a device substantially similar to the OSR Apparatus to perform the same services in its business as OSR and did not develop such device or engage in such business until after Pirl started work for OSR.

23. Prior to his employment with OSR, Pirl had no experience in the business. Pirl himself does not have the knowledge, skill or expertise to have reverse engineered or otherwise replicated the OSR Apparatus on his own and would have had to have either memorized or photographed proprietary characteristics of the OSR Apparatus for use by a third party.

24. We at OSR taught Pirl everything substantive he knows about the business of cleaning waterways. Before coming to OSR, I believe that Pirl was involved in the shipping business. As can be seen from the Manual, this process involves specialized knowledge of

meteorological and geological factors. It has taken me years of experience to compile the information contained in the Manual.

25. I believe that Pirl has been using his knowledge of OSR's potential leads and customers as well as OSR's pricing information to solicit those potential leads and customers and to undercut OSR's bidding for jobs. Even before Pirl terminated his employment with OSR, US was up and running. Either before or shortly thereafter his termination, US was aggressively bidding on customers OSR had previously identified as active prospects.

26. Pirl's conduct discussed above in misappropriating the OSR Apparatus and OSR's pricing and customer contact information constitutes a breach of Pirl's above covenants. More specifically, Pirl has breached the covenants contained in his Confidentiality Agreement by:

    (a)    using a device similar to the OSR Apparatus in US' business operations;

    (b)    using Processes that he learned while employed at OSR in US' business operations;

    (c)    using knowledge of OSR's pricing information illicitly obtained while employed by OSR to undercut OSR in bidding and to otherwise gain an improper competitive advantage;

    (d)    using knowledge of OSR's customer contact information illicitly obtained while employed by OSR to contact potential OSR customers on behalf of US;

    (e)    publishing marketing materials which are identical or at least substantially similar to aspects of OSR's marketing materials;

    (f)    publishing OSR's confidential information to the public-at-large, including, but not limited to, a magazine article; and,

    (g)    otherwise misappropriating OSR Trade Secrets in US' business operations.

27. OSR filed its Complaint on February 15, 2008, prior to the commencement of the Spring, Summer and Fall Seasons where OSR (and presumably US) do most of their business. Once the Spring season was in full swing, OSR retained a private investigator to confirm the

various allegations of OSR's Complaint and to provide documentary evidence thereof, and OSR has promptly brought this Motion after a full analysis of such evidence.

_____
Richard Kohutko

# 5471933_v1

# NOTICE

## ATTACHMENTS TO DECLARATION CONTAIN CONFIDENTIAL TRADE SECRET INFORMATION

## PLAINTIFF HAS REQUESTED LEAVE OF COURT TO FILE ATTACHMENTS UNDER SEAL AND WILL DO SO ONCE SUCH LEAVE IS GRANTED